JUSTICE SAMOUR delivered the Opinion of the Court.
*732 ¶1 "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." Griffin v. Illinois , 351 U.S. 12, 19, 76 S.Ct. 585, 100 L.Ed. 891 (1956). This declaration of timeless reverence is now imbedded in the marrow of our nation and woven into the tapestry of our criminal justice system. State and federal jurisdictions alike apply it widely beyond the trial context. But it is not without parameters. As sensitive as courts have been to the plight of indigent defendants, they have recognized that the protection afforded such defendants must be balanced against certain fundamental state interests, including in sentencing. The inherent tension between the unique challenges faced by indigent defendants and the State's sentencing interests is at the core of the question we confront today: Does it violate due process or equal protection to revoke a defendant's probation and sentence him to imprisonment if his failure to comply with probation was not willful and was caused instead by a lack of financial resources?
¶2 In Bearden v. Georgia , the United States Supreme Court held that when a probationer fails to pay a fine or restitution as a condition of probation, "despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment." 461 U.S. 660, 672, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). Although we have never had occasion to apply Bearden , we do not write on a clean slate. In the decade-plus preceding Bearden , we concluded in a trilogy of cases that probation can be revoked for failure to make a payment only when such failure is unreasonable or willful. See Strickland v. People , 197 Colo. 488, 594 P.2d 578, 579-80 (1979) (restitution payments); People v. Romero , 192 Colo. 106, 559 P.2d 1101, 1101-02 (1976) (ordered attorney fees); People v. Silcott , 177 Colo. 451, 494 P.2d 835, 836-37 (1972) (child support payments).
¶3 But neither Bearden nor any of our prior cases resolved the question raised by the defendant, Jeremy Keith Sharrow, in this appeal because the trial court did not revoke his probation and impose imprisonment based on his failure to fulfill a financial obligation as a condition of his probation. Rather, it did so because it found that he had violated nonpayment conditions of his probation: he moved from his established residence without his probation officer's authorization and he was terminated from a sex-offender-treatment program he was required to complete. Sharrow claimed that these violations were not unreasonable or willful because they were caused by his indigency-he could afford to pay for neither rent nor treatment.
¶4 Does Bearden apply to Sharrow's circumstances? Does our jurisprudence? A division of the court of appeals concluded that neither does and ruled that, since the probation conditions that Sharrow violated did not involve a required payment, the trial court was not compelled to determine whether his probation violation was "unreasonable and willful." People v. Sharrow , No. 13CA1164, slip op. at 5 (Colo. App. Dec. 24, 2015). Therefore, concluded the division, Sharrow's due process claim fell short. Id. , slip op. at 8.
¶5 In this appeal, Sharrow contends that his imprisonment following the revocation of his probation not only violated his due process rights, but also his right to equal protection. We conclude that Sharrow's constitutional rights were not violated, but our analysis differs from the division's.
¶6 Today we adopt the rule announced in Bearden for all probation revocation proceedings in which the defendant asserts that he lacked the financial means to comply with a nonpayment condition of probation.[1] We hold *733 that when a probationer defends against an alleged violation of a nonpayment condition of probation based on his lack of financial means, the trial court cannot revoke probation and impose imprisonment without first determining whether he failed to comply with probation willfully or failed to make sufficient bona fide efforts to acquire resources to comply with probation. If the trial court finds that the defendant willfully refused to comply with probation or failed to make sufficient bona fide efforts to acquire resources to do so, it may revoke probation and impose imprisonment. On the other hand, if the trial court finds that the defendant could not comply with probation despite sufficient bona fide efforts to acquire resources to do so, it must consider alternatives to imprisonment. Only if alternate measures are not adequate to fulfill the State's sentencing interests, including in punishment, deterrence, rehabilitation, and community safety, may the court imprison an indigent defendant who, notwithstanding sufficient bona fide efforts to comply with probation, nevertheless failed to do so. By the same token, even if the trial court finds that an indigent defendant is not at fault for failing to comply with probation because he made sufficient bona fide efforts to acquire resources to do so, imprisonment following the revocation of probation is appropriate if there is no adequate alternative to fulfill the State's sentencing interests.
¶7 During his probation revocation hearing, Sharrow presented evidence of both his indigency and his efforts to find a job in order to generate sufficient income to allow him to comply with probation. But the trial court found, with record support, that Sharrow did not make sufficient bona fide efforts to obtain employment. Therefore, it did not violate Sharrow's constitutional rights by revoking his probation and imposing imprisonment. Because the division upheld the trial court's decision, we affirm, albeit on other grounds.
I. Procedural History
¶8 After sexually assaulting a fourteen-year-old child, Sharrow pled guilty in January 2010 to one count of sexual assault (victim under fifteen), a felony, and one count of unlawful sexual contact, a misdemeanor. Pursuant to the parties' plea agreement, the trial court dismissed the remaining charges, placed Sharrow on a four-year deferred judgment and sentence ("deferred judgment") on the sexual assault count, and imposed the following concurrent sentences: four years of sex offender intensive supervision probation (SOISP) and sixty days in jail on the sexual assault count; and five years of intensive supervision probation (ISP) on the sexual contact count.
¶9 Between 2010 and 2013, the probation department filed three separate complaints seeking to revoke Sharrow's deferred judgment and probation. We describe each complaint and its related litigation in some detail to place Sharrow's appeal in context.
A. First Complaint
¶10 In July 2010, Sharrow's probation officer filed a complaint to revoke Sharrow's deferred judgment and probation based on numerous alleged violations. As pertinent here, the probation officer asserted that Sharrow had moved to a different residence without prior approval and had been terminated from offense-specific treatment. In October 2011, the trial court (with a new judge presiding) held an evidentiary hearing, at the end of which it found that "sufficient allegations [had] been proven" by the prosecution. The trial court thus revoked Sharrow's deferred judgment and probation, and entered a judgment of conviction on the guilty plea to the sexual assault count.
¶11 During the ensuing resentencing hearing, Sharrow explained that the primary reason for leaving his residence and moving in with a friend, Brenda Geiger, "was not having *734 enough money to pay for rent." In determining whether to place Sharrow back on supervised probation in lieu of imprisonment, the trial court indicated that it found "very, very troubling" that Sharrow had absconded from probation for five months. However, based in part on Geiger's remarks, the trial court gave Sharrow "one more chance," though it did its best to impress upon him that he was "on the doorstep of prison" and that no other probation violations would be tolerated:
I will give him one more chance at probation, but Mr. Sharrow, we must be clear.... Any violation of any term and condition, no matter how technical it may seem to you, in my opinion, warrants the Probation Department filing another complaint against you. You've had your chance. This time you operate without a net. There's nowhere to go but prison.... Any violation of any term of your probation will be considered by me sufficient to place you in prison. There are no excuses.
Notably, the trial court informed Sharrow that money would continue to "be a big obstacle." But, upon being asked whether he "still want[ed] to do this," Sharrow responded, "Yes." Thus, the trial court resentenced Sharrow to SOISP for an indeterminate period of at least ten years on the sexual assault conviction and to ISP for five years on the sexual contact conviction, to be served concurrently.
B. Second Complaint
¶12 Four months later, in February 2012, Sharrow's probation officer filed another complaint to revoke probation, alleging numerous violations, including that Sharrow had changed residence without authorization again and had failed to seek or maintain lawful employment. In October 2012, after the complaint was amended to add an allegation that Sharrow had been terminated from another offense-specific-treatment program, the matter proceeded to an evidentiary hearing in front of a third judge, who found that Sharrow had violated some conditions of his probation.
¶13 During the resentencing hearing, defense counsel presented a letter from RSA, Inc. (RSA), a treatment program willing to work with Sharrow. The prosecution expressed concern with placing Sharrow on probation again, including because Sharrow was going to "have to pay for [his] treatment," which was "an issue ... last time" and one of the reasons "he was terminated from treatment," and there was no indication as to how that issue would be addressed.
¶14 Although the trial court shared the prosecution's concerns, it nevertheless gave Sharrow a "third" chance on probation, cautioning him that it would be his "last." As the judge put it, "[i]t's either success here, or to be blunt, probably 10 years once I send you to prison [on an indeterminate sentence with a minimum term of two years] before you'll even have a chance to ask the parole commission to consider you" for release. Sharrow was again placed on SOISP for an indefinite term of at least ten years on the sexual assault conviction. On the sexual contact conviction, the trial court resentenced him to 300 days in the county jail, but awarded him 300 days credit for time served.
¶15 Importantly, after Sharrow was resentenced, the probation officer informed the trial court that, like other programs, RSA had shared living arrangements (SLAs), but unlike other programs, RSA required defendants to find an apartment, put down a deposit, and pay for the first month's rent. The probation officer was worried that Sharrow was going to run into the same problem he had experienced before-not having an approved residence in which to live after his release from jail. According to the probation officer, the probation department had already spent $5,855 toward Sharrow's residence at a motel while he was previously enrolled in SLAs in conjunction with treatment programs, and it would "take some money to come up with a deposit and his first month's rent to actually get into a shared living arrangement at RSA." Defense counsel responded that everyone understood that Sharrow "ha[d] to get a job, ... ha[d] to make some money, [and] ha[d] to pay for this." But she asked that the probation department give him a little time to do so by temporarily paying for a motel again. She further requested that Sharrow be allowed to have contact with Geiger so that she could *735 provide much-needed support, including transportation and clothing.
¶16 After learning that it would cost $700 to house Sharrow in a motel for another month, the trial court agreed "to bend the rules" and ordered the probation department "to fund one month ... and one month only" at a motel. It further ordered that Geiger be allowed to have "substantial contact" with Sharrow to assist him with transportation and clothing as he attempted to qualify for the SLAs at RSA. Because the trial court viewed Geiger as Sharrow's "lifeline to try and get him into a normal life," it also authorized her to bring him food and have social visits with him. Before adjourning, the trial court warned Sharrow that he had one month, until January 5, 2013, "to get some money" for the SLAs at RSA. The trial court reiterated that this was "Sharrow's responsibility," as he had "asked to be placed [at] RSA."
C. Third Complaint
¶17 Less than two months after Sharrow's probation was reinstated, a third complaint to revoke probation was filed by his new probation officer. The amended version of that complaint alleged, among other things, that Sharrow had moved from his established residence without permission yet again and had been terminated by RSA. The fourth judge to preside over Sharrow's post-plea proceedings held an evidentiary hearing during which the probation officer and Sharrow both testified. The probation officer stated that, pursuant to the trial court's order, Sharrow had received a voucher to pay for four weeks of rent at a motel. He added that he had then obtained approval from his supervisor to pay for two more weeks of rent at the same motel "to get [Sharrow] a little bit more opportunity" to find a job in the hopes that Sharrow would soon be able to stand on his own two feet.
¶18 For his part, Sharrow explained that he left the motel and moved into a shelter because, after using the two vouchers provided by the probation department, which paid for his motel room for six weeks, he still lacked the funds to pay for rent. As for his termination from RSA, Sharrow said that he attempted to attend most of the individual and group therapy sessions, but was turned away by RSA for lack of funds. However, the probation officer noted that Sharrow could have attended "study hall" for free at RSA, but had failed to do so. According to the probation officer, study hall "allows another level of containment or accountability" for probationers who cannot afford to pay for the individual or group treatment sessions.
¶19 Of particular relevance here, both the probation officer and Sharrow discussed Sharrow's financial situation and his efforts to acquire the resources to comply with probation. Sharrow testified that he tried to get a job, but was unable to do so. He cited his conviction as a sex offender and his lack of transportation as hurdles he could not overcome. The probation officer countered that Sharrow had not sought employment every day, had not "show[n] much of an effort for someone who [was] essentially [in] dire strai[ts]," and seemed to have an expectation that "probation [would] continue to fund him." In short, the probation officer believed that "looking for a job was not that important" to Sharrow.[2]
¶20 At the end of the hearing, the trial court found that the evidence established that Sharrow had violated his probation by moving from his residence without the consent of his probation officer and by failing to actively attend and participate in RSA's sex-offender-treatment program. The trial court then addressed Sharrow's contention that "[his] inability to pay ... was the basis of all of his violations [of probation] and that it would violate his fundamental [right to] due process" to have his probation revoked and to be resentenced to imprisonment "for not being able to pay":
That argument would have more weight if I were convinced that Mr. Sharrow had done everything he can to try and earn money. And I think the clear testimony and implication from his probation officer was that he didn't appear to be making the best effort that he could make to obtain *736 employment. And so that argument about ... being [revoked] because he can't pay, I think assumes that he is doing everything he can to get a job. And I am not convinced that he was and his probation officer wasn't convinced that he was doing everything that he could.... And again I [am] not convinced that Mr. Sharrow made the best effort that he could make to try to get a job.... So I find that the People have proven that the defendant is guilty of violating the amended complaint as charged.
The trial court resentenced Sharrow to imprisonment for an indeterminate period with a minimum term of at least two years.
¶21 Sharrow appealed the trial court's order. He did not dispute that he moved from his established residence without permission or that he was terminated from RSA's treatment program. Instead, he argued that his sentence to imprisonment following his probation revocation violated his due process rights because there was insufficient evidence to demonstrate that his failure to comply with probation was "unreasonabl[e] or willful[ ]." Sharrow , slip op. at 5. A division of the court of appeals disagreed, concluding that the trial court was not required to determine whether his violation of probation was unreasonable and willful or whether he had the ability to pay rent and for RSA's treatment program. Id. , slip op. at 7-8. In so doing, the division distinguished the cases on which Sharrow relied- Bearden , Strickland , Romero , and Silcott -on the ground that they "involve[d] ... a [probation] condition that required a monetary payment." Id. , slip op. at 5-6. The division found People v. Colabello , 948 P.2d 77 (Colo. App. 1997), more persuasive. Id. , slip op. at 6-7. In Colabello , another division of the court of appeals determined that Strickland does not require a trial court "to find that a defendant 'willfully or unreasonably' failed to comply with any terms of probation other than payment of restitution." 948 P.2d at 80. Because the term of probation at issue there was the successful completion of appropriate treatment, "a critical prerequisite to allowing [Colabello] back into the community," the division ruled that the "well-intentioned but unsuccessful attempt at completion" of such treatment was not sufficient to "maintain ... probationary status." Id. at 79-80.
¶22 Agreeing with Colabello 's rationale, the division here held that the right to due process did not require a finding that Sharrow acted unreasonably or willfully in violating his probation. Sharrow , slip op. at 8. The division recognized "the seeming unfairness" of its decision, but explained that "the law in this area is clear" and it was not its role to make a policy change. Id. In any event, noted the division, the trial court considered Sharrow's financial situation and found that he had failed to make adequate efforts to secure employment and earn money. Id. , slip op. at 8-9.
¶23 Sharrow then brought this appeal.[3]
II. Analysis
¶24 Sharrow claims that the trial court's imprisonment sentence following the revocation of his probation violated his constitutional rights to due process and equal protection.[4] He urges us to reverse the judgment of *737 the court of appeals and to rule, instead, that the trial court was required to determine whether his noncompliance with probation was willful or unreasonable. Moreover, continues Sharrow, to the extent the trial court considered his financial situation, it failed to apply the correct legal standard in deciding whether he made good faith efforts to obtain the resources to comply with probation. In advancing these contentions, Sharrow relies primarily on Strickland , Romero , and Silcott , though he also leans heavily on Bearden .
¶25 On the other side of the equation, the prosecution asks us to affirm the judgment of the court of appeals. Relying on the probation revocation statute, section 16-11-206(3), C.R.S. (2018), it argues that inquiry into a defendant's financial ability is required only when the alleged probation violation involves a requirement "to pay court-ordered compensation to appointed counsel, probation fees, court costs, restitution, or reparations." The prosecution contends that, since Sharrow's probation revocation was not grounded in the failure to make such a required payment, it was within the trial court's discretion whether to continue or revoke his probation. Alternatively, asserts the prosecution, the trial court allowed Sharrow to present evidence of his lack of financial means and of his bona fide efforts to obtain resources to comply with probation, but ultimately found that he failed to meet his burden of establishing an inability to pay. In this regard, the prosecution maintains that when a probationer asserts in a revocation proceeding that he lacked the financial ability to comply with probation, the burden of proof must shift to him.
¶26 We first discuss the standard of review governing this appeal. We then segue to Bearden . After examining Bearden , we adopt the rule it announced for all probation revocation proceedings in which the defendant asserts that he lacked the financial means to comply with a nonpayment condition of probation. We end by applying Bearden and concluding that Sharrow's constitutional claims cannot prevail because the record supports the trial court's finding that he failed to make sufficient bona fide efforts to acquire resources to comply with probation. As we explain, though, today's decision does not alter the prosecution's burden of proof in a probation revocation hearing.
A. Standard of Review
¶27 The interpretation of the United States Constitution is a "question[ ] of law, which we review de novo." People v. Higgins , 2016 CO 68, ¶ 7, 383 P.3d 1167, 1169. Although trial courts have broad discretion in sentencing hearings, "constitutional challenges to sentencing determinations" are likewise "reviewed de novo." Villanueva v. People , 199 P.3d 1228, 1231 (Colo. 2008).
¶28 In general, a "trial court's factual findings" are entitled to deference on appeal. People v. Bailey , 2018 CO 84, ¶ 17, 427 P.3d 821, 826. Thus, we do not disturb factual findings "if they are supported by competent evidence in the record." Id. (quoting People v. Castaneda , 249 P.3d 1119, 1122 (Colo. 2011) ).
B. Bearden v. Georgia
¶29 We start our analysis by examining Bearden v. Georgia . Because the Supreme Court's holding serves as the foundation for our decision, we delve into it in depth.
¶30 As a condition of probation, Bearden was required to pay a $500 fine and $250 in restitution, for a total of $750. Bearden , 461 U.S. at 662, 103 S.Ct. 2064. He was to pay $100 the day of the sentence, $100 the next day, and the remaining $550 within four months. Id. Bearden borrowed $200 from his parents to make the initial two $100 payments, but was unable to make any other payments. Id. at 662-63, 103 S.Ct. 2064. He was laid off from work a month after he was sentenced, and with only a ninth-grade education and an inability to read, he was unable to get another job, although he "tried repeatedly" to do so. Id.
¶31 A few months after the balance of the fine and restitution came due, the State filed a petition to revoke Bearden's probation. Id. at 663, 103 S.Ct. 2064. Following an evidentiary hearing, the trial court revoked Bearden's probation and sentenced him to serve the remaining portion of his probationary period in prison. Id. The Georgia Court of Appeals affirmed, rejecting Bearden's claim *738 that imprisoning him based on his financial inability to pay the fine and restitution violated the Equal Protection Clause of the Fourteenth Amendment. Id. The Georgia Supreme Court subsequently denied review. Id.
¶32 The question presented in Bearden was whether the Fourteenth Amendment prohibits a State from "revok[ing] a defendant's probation for failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." Id. at 665, 103 S.Ct. 2064. The Court recognized that resolution of the issue required a careful balance between, on the one hand, "the acceptability, and indeed wisdom, of considering all relevant factors when determining an appropriate sentence" for a defendant and, on the other, "the impermissibility of imprisoning a defendant solely because of his lack of financial resources." Id. at 661, 103 S.Ct. 2064. Regardless of whether Bearden's claim was viewed through the equal protection lens or the due process lens, the Court explained that its merits could not be addressed "by resort to easy slogans or pigeonhole analysis." Id. at 666, 103 S.Ct. 2064. Instead, the Court had to consider "such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose.' " Id. at 666-67, 103 S.Ct. 2064 (quoting Williams v. Illinois , 399 U.S. 235, 260, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) (Harlan, J., concurring)).
¶33 In resolving Bearden's appeal, the Court invoked the rule it had established the previous decade in Williams and Tate v. Short , 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) : "the State cannot 'impos[e] a fine as a sentence and then automatically conver[t] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.' " Bearden , 461 U.S. at 667, 103 S.Ct. 2064 (quoting Tate , 401 U.S. at 398, 91 S.Ct. 668 ). Significantly, the Bearden Court "carefully distinguished" between the imposition of imprisonment based exclusively on a defendant's lack of resources to pay "from the situation where a defendant [is] at fault in failing to pay." Id. at 668, 103 S.Ct. 2064. The State cannot "imprison a person solely because he lack[s] the resources to pay" a fine or restitution, the Court said, echoing its earlier pronouncements. Id. at 667-68, 103 S.Ct. 2064. But the Court made clear that, since nothing "precludes imprisonment" when the defendant's refusal to pay is willful, id. at 668, 103 S.Ct. 2064 (quoting Williams , 399 U.S. at 242 n.19, 90 S.Ct. 2018 ), there is no "constitutional infirmity" in imprisoning a defendant who has the means to pay, but nevertheless fails to do so, id. (quoting Tate , 401 U.S. at 400, 91 S.Ct. 668 ).[5]
¶34 The presence or absence of fault, however, is not the end of the analysis under Bearden . As the Court acknowledged, the State "has a fundamental interest in appropriately punishing persons-rich and poor-who violate its criminal laws." Id. at 669, 103 S.Ct. 2064. Consequently, poverty cannot bestow immunity from prison on an indigent defendant, even when his failure to make a payment is without fault. Id. And, while the decision to grant a defendant probation in the first place reflects the trial court's determination that imprisonment was not necessary to fulfill the State's penological interests, a defendant's "failure to make reasonable efforts to repay his debt to society" while on probation may indicate that the original determination warrants reevaluation, as "imprisonment may now be required to satisfy the State's interests." Id. at 670, 103 S.Ct. 2064.
¶35 Of course, the State's sentencing interests, including in punishment, may be attainable by alternative means. Id. at 671-72, 103 S.Ct. 2064. For that reason, the adequacy of such means must be considered before a trial court may imprison an indigent probationer who has made sufficient bona fide efforts to pay. Id. at 672, 103 S.Ct. 2064.
*739 ¶36 Considering all of the pertinent factors together, the Court in Bearden held as follows:
[I]n revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment.... If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.
Id. at 672-73, 103 S.Ct. 2064. Because the trial court had automatically resentenced Bearden to prison "without considering the reasons for the inability to pay" or alternative means to achieve the State's sentencing interests, the Court reversed the judgment of the Georgia Court of Appeals and remanded the matter for further proceedings. Id. at 674, 103 S.Ct. 2064. The Court instructed the trial court to determine on remand whether Bearden had made sufficient bona fide efforts to pay and, if so, whether alternate punishment was adequate to meet the State's sentencing interests. Id.
C. Adopting the Rule in Bearden for Probation Revocation Proceedings Involving Nonpayment Conditions of Probation
¶37 This is our first opportunity to adopt the rule in Bearden . We do so for all probation revocation proceedings in which the defendant asserts that he lacked the financial means to comply with a nonpayment condition of probation.
¶38 The linchpin of the decision in Bearden was the presence or absence of fault in an indigent defendant's failure to make a payment required as a condition of probation. For the Court, this distinction had "critical importance." Id. at 668, 103 S.Ct. 2064. When a probationer willfully refuses to pay despite having the financial means to do so or fails to make sufficient bona fide efforts to obtain resources to pay, the State is justified in revoking probation and imposing imprisonment. Id. But when a probationer makes all reasonable efforts to pay and yet cannot do so through no fault of his own, "it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods" of punishment are available. Id. at 668-69, 103 S.Ct. 2064. It is the lack of fault that provides a substantial reason to justify or mitigate the violation of probation and makes imprisonment inappropriate. See id. at 669, 103 S.Ct. 2064. To deprive an indigent probationer of his conditional freedom merely "because, through no fault of his own, he cannot pay" is "contrary to the fundamental fairness required by the Fourteenth Amendment." Id. at 672-73, 103 S.Ct. 2064.
¶39 We see no reason to distinguish between a payment that is required as a condition of probation and a payment that is required to satisfy a nonpayment condition of probation. If it is unconstitutional to automatically imprison an indigent defendant solely because, through no fault of his own, he cannot pay a fine or restitution as a condition of probation, it must be equally unconstitutional to automatically imprison an indigent defendant solely because, through no fault of his own, he cannot pay to remain in a particular residence or to complete sex-offender treatment as a condition of probation. In both scenarios it is fundamentally unfair and offensive to the Fourteenth Amendment to automatically deprive the defendant of his conditional freedom simply because, through no fault of his own, he lacks the financial means to comply with probation. Simply put, the right to equal justice is infringed in both situations.
¶40 We are not persuaded by the prosecution's attempt to distinguish Bearden on the ground that Colorado law does not sanction the automatic imprisonment of someone *740 whose probation has been revoked, vesting trial courts instead with discretion "to continue ... probation." True, our trial courts are not required to impose imprisonment or another form of incarceration upon the revocation of probation-they may regrant probation or choose a different resentencing option that does not involve incarceration. But Georgia law did not require the automatic imposition of a jail sentence following Bearden's probation revocation either. Id. at 662-63, 103 S.Ct. 2064. Yet, the Court reversed the judgment of the Georgia Court of Appeals affirming the trial court's decision to resentence Bearden to imprisonment without determining the reasons for his inability to pay or the adequacy of alternative sentencing options. Id. at 674, 103 S.Ct. 2064. The trial court there was specifically directed to make these determinations on remand. Id.
¶41 In other words, the trial court in Bearden failed to exercise its discretion and "automatically turned a fine into a prison sentence," thereby violating Bearden's Fourteenth Amendment rights. Id. This is the very evil we seek to avert today. Absent today's opinion, a Colorado trial court, despite having discretion, or perhaps because of it, could automatically revoke probation and impose imprisonment solely because, through no fault of his own, an indigent defendant cannot pay to remain in a designated residence or complete treatment.
¶42 Guided by the rationale in Bearden , we hold that when a probationer defends against an alleged violation of a nonpayment condition of probation based on his lack of financial means, the trial court cannot revoke probation and impose imprisonment without first determining whether he failed to comply with probation willfully or failed to make sufficient bona fide efforts to acquire resources to comply with probation.[6] If the trial court finds that the defendant willfully refused to comply with probation or failed to make sufficient bona fide efforts to acquire resources to do so, it may revoke probation and impose imprisonment. On the other hand, if the trial court finds that the defendant could not comply with probation despite sufficient bona fide efforts to acquire resources to do so, it must consider alternatives to imprisonment. Only if alternate measures are not adequate to fulfill the State's sentencing interests, including in punishment, deterrence, rehabilitation, and community safety, may the court imprison an indigent defendant who, notwithstanding sufficient bona fide efforts to comply with probation, nevertheless failed to do so.[7] By the same token, even if the trial court finds that an indigent defendant is not at fault for failing to comply with probation because he made sufficient bona fide efforts to acquire resources to do so, imprisonment following the revocation of probation is appropriate if there is no adequate alternative to fulfill the State's sentencing interests.
¶43 Where the probationer's failures are related to the very reasons probation was granted and, consequently, frustrate the purposes of probation, such failures directly thwart the State's sentencing interests and render revocation "fair and appropriate even if the probationer did not willfully violate his probation conditions." United States v. Warner , 830 F.2d 651, 657 (7th Cir. 1987) (relying on Bearden , 461 U.S. at 668 n.9, 103 S.Ct. 2064 ). For example, "it may indeed be reckless for a court to permit a person convicted of driving while intoxicated to remain on probation once it becomes evident that efforts at controlling his chronic drunken driving have failed." Bearden , 461 U.S. at 668 n.9, 103 S.Ct. 2064. Regardless of the reasons for that probationer's failures, allowing him *741 to remain on probation or regranting him probation because he undertook bona fide efforts to comply with it would constitute a "threat to the safety or welfare of society." Id . The same holds true for a sex offender who, despite bona fide efforts to complete the required treatment, fails to do so. "Ultimately, it must be remembered that the sentence was not imposed for a circumstance beyond the probationer's control 'but because he had committed a crime.' " Id. (quoting Williams , 399 U.S. at 242, 90 S.Ct. 2018 ).
¶44 We are cognizant that, unlike the failure to discharge a fine or restitution in Bearden , a defendant's indigency will not always be relevant where, as here, nonpayment conditions of probation are alleged to have been violated. Therefore, when the condition of probation allegedly violated is not a required payment, the trial court is under no obligation to inquire sua sponte about the reasons for the defendant's alleged failure to comply with probation. Rather, it is incumbent on the defendant to assert that his lack of financial means prevented him from complying with a nonpayment condition of probation. This begs the question as to who bears the burden of proof in a probation revocation proceeding in which the defendant advances such a claim. The prosecution asks us to incorporate the burden-shifting procedure we endorsed in People v. Afentul , 773 P.2d 1081, 1085 (Colo. 1989). We decline to do so.
¶45 Our decision in Afentul was tethered to the language of the deferred judgment statute then in effect, 16-7-403(2), C.R.S. (1986),[8] addressing a defendant's failure "to make restitution" as a condition of a deferred judgment. Id. (citing section 16-7-403(2), which read as follows: "When, as a condition" of a deferred judgment, "the court orders the defendant to make restitution, evidence of failure to pay the said restitution shall constitute prima facie evidence of a violation").[9] Given that Sharrow's appeal does not implicate the failure to pay restitution as a condition of a deferred judgment, the current iteration of the deferred judgment statute ( section 18-1.3-102(2), C.R.S. (2018) ) and Afentul are inapposite.
¶46 The part of section 16-11-206(3) on which the prosecution relies, which addresses a "probationer's failure to pay court-ordered compensation to appointed counsel, probation fees, court costs, restitution, or reparations," is equally inapplicable. Because the conditions of probation Sharrow violated did not involve his failure to make any such payment, the prosecution's reliance on that part of section 16-11-206(3) is misplaced.
¶47 Instead, a different part of section 16-11-206(3) applies. That part of the subsection lays the burden of proof squarely at the feet of the prosecution when the alleged violation does not relate to a failure to pay court-ordered compensation, fees, costs, restitution, or reparations. See § 16-11-206(3). It provides that, at a probation revocation hearing, "the prosecution has the burden of establishing by a preponderance of the evidence the violation of a condition of probation; except that the commission of a criminal offense must be established beyond a reasonable doubt" if the defendant has not "been convicted thereof in a criminal proceeding." Id.
¶48 Keeping the burden of proof at the prosecution's table is not only consistent with section 16-11-206(3) -it is also fair. In cases such as this one, the prosecution's burden of proof will always be by a preponderance of the evidence, not the more rigorous beyond-a-reasonable-doubt standard. Moreover, at a revocation hearing, the probation officer should be very familiar with the probationer's financial situation. We expect that a probation officer will be able to testify about the defendant's needs, financial means, and requests for financial assistance, as well as any communications related to those requests, any financial assistance provided, and any *742 efforts the defendant may have made toward obtaining employment or otherwise acquiring resources to comply with probation. After considering all the evidence presented, the trial court will be in a suitable position to make the determinations we require today, mindful that the burden to prove a violation of a nonpayment condition of probation ultimately rests with the prosecution.
¶49 In sum, today we adopt the holding in Bearden for all probation revocation hearings in which the defendant asserts that he lacked the financial means to comply with a nonpayment condition of probation. However, nothing in this opinion should be interpreted as altering the prosecution's burden of proof in a revocation proceeding.
D. Application
¶50 During his revocation hearing, Sharrow presented evidence of his indigency and the efforts he undertook to obtain employment in order to acquire resources to comply with probation. But the trial court found, with record support, that Sharrow's attempts to obtain employment did not constitute sufficient bona fide efforts. We defer to this determination and conclude that the trial court's revocation of probation and resentence to imprisonment neither unfairly deprived Sharrow of his conditional freedom nor infringed on his constitutional rights to due process and equal protection.[10]
¶51 Sharrow complains that the trial court applied the wrong legal standard in concluding that he failed to make sufficient bona fide efforts to obtain a job. The trial court, asserts Sharrow, was required to find that: (1) a job for which he was qualified was available; (2) the job would have produced enough income to allow him to comply with probation; and (3) he unjustifiably refused to take the job. This three-part test has its genesis in Strickland and Romero . See Strickland , 594 P.2d at 579 ; Romero , 559 P.2d at 1102. However, Strickland and Romero preceded Bearden , and Bearden did not delineate how a trial court should go about determining what constitutes sufficient bona fide efforts to obtain employment or to otherwise acquire resources to comply with probation. Nor do we think it wise to micromanage trial courts in this area or to restrict their discretion. We are comfortable that trial courts are quite capable of exercising their discretion in ascertaining whether an indigent defendant has undertaken sufficient bona fide efforts to obtain a job or to otherwise acquire resources to comply with probation. This is especially the case given that a probation officer will typically possess extensive information about such efforts, if any.
III. Conclusion
¶52 We conclude that the trial court did not violate Sharrow's rights under the Fourteenth Amendment when it revoked his probation and resentenced him to prison. Therefore, we affirm the judgment of the court of appeals, albeit on different grounds.

Our holding is circumscribed to a defendant's financial inability to comply with conditions of probation which, on their face, do not establish a monetary obligation. We decline to adopt the Bearden rule with respect to a defendant's failure to comply with payment-related conditions of probation given that Colorado law already addresses a defendant's indigency in that context. See, e.g. , § 18-1.3-702(2)(b), C.R.S. (2018) (When a trial court "imposes a sentence, enters a judgment, or issues an order" requiring the defendant "to pay any monetary amount," the court must advise the defendant that if he "lacks the present ability to pay the monetary amount due without undue hardship" to him or his dependents, "the court shall not jail the defendant for failure to pay."); Crim. P. 32(c)(3)(I) (same). To avoid repetition, though, throughout this opinion we sometimes refer to probation, conditions of probation, and violations of probation in general and refrain from specifying each time that we mean nonpayment conditions of probation or violations of such conditions.

The probation officer acknowledged that Geiger had offered Sharrow a job as a cook at a bar and grill establishment she owned. However, he testified that this was primarily a bar that served food, and probationers are generally not allowed to possess alcohol.

We granted certiorari on the following two issues:
1. Whether the court of appeals erred in concluding that, in the circumstances of this case, the trial court did not need to find that the petitioner had the financial ability to comply with the obligations of his probation before revoking probation.
2. If so, whether the trial court applied the correct standard to find that the petitioner has the ability to pay.

"Due process and equal protection principles converge in the ... analysis in these cases." Bearden , 461 U.S. at 665, 103 S.Ct. 2064. To ascertain if there has been a violation of a defendant's right to equal protection, the court "must determine whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation." Id. at 665-66, 103 S.Ct. 2064. "This is substantially similar to asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine." Id. at 666, 103 S.Ct. 2064. Although the Court in Bearden suggested that due process may provide the most appropriate approach, see id. at 666 n.8, 103 S.Ct. 2064, in the end, it did not have to choose between the due process and equal protection approaches because they require similar considerations in this context. Id. at 666-67, 103 S.Ct. 2064.

Relying on Williams and Tate , in Kinsey v. Preeson , 746 P.2d 542, 549-50 (Colo. 1987), we declared unconstitutional Colorado's "body execution statute," section 13-59-103, C.R.S. (1987), which contemplated imprisonment for failure to satisfy a civil judgment within the prescribed timeframe.

We refer to the imposition of "imprisonment" following the revocation of probation because Sharrow received a prison sentence to the Department of Corrections after his probation was revoked. However, since what we aim to ward off is the unfair deprivation of an indigent probationer's conditional freedom, our holding applies with equal force to jail sentences and direct community corrections sentences following the revocation of probation for violation of a nonpayment condition of probation.

Bearden mentioned only two State interests in sentencing: punishment and deterrence. 461 U.S. at 671-72, 103 S.Ct. 2064. But we do not read Bearden as having identified an exhaustive list of such interests. In Colorado, our legislature has established that the purposes of sentencing include: punishment, deterrence, the prevention of crime and the promotion of respect for the law, reduction of the potential that the offender will engage in criminal conduct after completion of his sentence, and rehabilitation. § 18-1-102.5(1), C.R.S. (2018) (listing these and other purposes).

Section 16-7-403(2) has since been repealed. The current version of the statute now appears at section 18-1.3-102(2), C.R.S. (2018). The relevant language has not been substantively altered.

In Afentul , we construed this statutory language as contemplating a burden-shifting procedure. We said that evidence that the defendant fails to pay restitution is "prima facie evidence" that he violated a condition of his deferred judgment, and once prima facie evidence has been presented by the prosecution, "the burden ... shifts to the defendant to establish by a preponderance of the evidence that he was financially unable to make the payments at the time they should have been made." 773 P.2d at 1085.

Given the trial court's finding that Sharrow failed to make sufficient bona fide efforts to obtain employment, we need not address whether adequate alternatives to revocation and imprisonment existed.